IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * |
| | * CRIMINAL NO. PX-20-445 |
| OLAYINKA WAHAB, | * |
| Defendant. | * |

*******

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING AND
RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, hereby submits the Government's Memorandum in Aid of Sentencing and Response to Defendant's Sentencing Memorandum. Defendant Olayinka Wahab ("Wahab") is scheduled to be sentenced on May 28, 2021. For the reasons set forth below, the Government submits that **30 months in prison, followed by 3 years of supervised release**, is a sentence sufficient but not greater than necessary to satisfy the goals of sentencing. The U.S. Probation Office concurs with the sentence recommended by the Government.

**I.     Background**

On December 9, 2020, Wahab was indicted on one count of copyright infringement, in violation of 17 U.S.C. § 506(a)(1)(A) and 18 U.S.C. § 2319(a) and (b)(1). (ECF No. 1.) Wahab had his initial appearance on December 16, 2020. Pursuant to a written plea agreement entered on February 26, 2021, the Defendant pled guilty to Count One of the Indictment. (ECF No. 17 ("Plea").) After accepting the Defendant's plea to this count and adjudging him guilty, the Court originally scheduled sentencing for May 18, 2021, and directed the U.S. Probation Office

("Probation") to prepare the Pre-Sentence Investigation Report ("PSR"), which was filed on April 30, 2021. (ECF No. 20 ("PSR").)

In the plea agreement, the parties agreed that the base offense level for Count One is **8**. (Plea ¶¶ 6(a).) The Government submits that a **12**-level enhancement applies because the amount of loss involved in the offense was more than $250,000 but not more than $550,000. The Government also submits that a **2**-level enhancement applies because the offense involved the importation of infringing items. (*Id.* ¶¶ 6(b)-(c).) The Defendant objected to both enhancements in the Plea. (*Id.*) The PSR applies the **12**-level enhancement and the **2**-level enhancement. (PSR ¶¶ 21, 22.) Accordingly, based on the PSR and the Government's calculation, the total offense level is **22**. (PSR ¶ 26.) The Government does not oppose a **2**-level reduction for acceptance of responsibility, and the Government agrees to move for an additional **1**-level reduction in recognition of the Defendant's timely notification of his intention to enter a plea of guilty. (*Id.* ¶ 6(d)). The final offense level is therefore **19**, as determined by the PSR and the Government. (PSR ¶ 30.) The parties did not reach agreement as to the Defendant's criminal history. The Government agrees with Probation's calculation that the Defendant's criminal history score is **0** and his criminal history category is therefore **I**. The United States Sentencing Guidelines (the "Sentencing Guidelines") prescribe a sentence in the range of 30 months to 37 months.

## II.   Legal Standard

In *United States v. Green,* 436 F.3d 449 (4th Cir. 2006), the Fourth Circuit held that after *United States v. Booker,* 543 U.S. 220 (2005), which made the Sentencing Guidelines effectively advisory, the district court is commanded to fulfill congressionally established objectives for sentencing set out in 18 U.S.C. § 3553(a): promoting respect for the law; providing just punishment for the offense; affording adequate deterrence; protecting the public from further

criminal activity of the defendant; providing the defendant training, medical care, and correctional treatment; and providing restitution to victims. *See Green,* 436 F.3d at 455; *see also United States v. Moreland,* 437 F.3d 424, 432 (4th Cir. 2006).

Thus, in conducting a sentencing, district courts must (1) calculate the sentence range recommended by the Sentencing Guidelines; (2) determine whether a sentence within that range and within statutory limits serves the statutory sentencing factors set out in 18 U.S.C. § 3553(a) and, if not, select a sentence that does serve those factors; (3) implement mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence, especially explaining why a sentence outside of the Sentencing Guidelines range better serves the relevant statutory sentencing purposes. *See Green,* 436 F.3d at 455-56; *Moreland,* 437 F.3d at 432. The explanation of a variant sentence must be tied to the factors set forth in § 3553(a) and must be accompanied by findings of fact as necessary. *See Green,* 436 F.3d at 455-56; *United States v. Perez-Pena,* 453 F.3d 236, 241 (4th Cir. 2006). The district court is given "some latitude," and "a degree of deference," to tailor a particular sentence to the circumstances. *Green,* 436 F.3d at 456-57; *Moreland,* 437 F.3d 433.

### III. The Government and the PSR have Correctly Applied the Two Disputed Sentencing Guidelines Enhancements

#### A. The Correct Estimation of the Loss is the Fair Market Value

"A district court may apply a sentencing enhancement if it is supported by a preponderance of the evidence." *United States v. Gray*, 446 F. App'x 569, 570 (4th Cir. 2011); *United States v. Scuderi*, 141 F.3d 1150, 1998 WL 161103, at *1 (1st Cir. 1998) (stating that "it is the government's burden to prove the retail value of the infringing items by a preponderance of the evidence"). Section 2B5.3 specifically focuses on "Criminal Infringement of Copyright or Trademark." After applying a base offense level of 8, under the "Specific Offense Characteristics," § 2B5.3(b)(1)

3

directs that the offense level should be increased based on the loss levels prescribed in § 2B1.1(b)(1).  In determining "the infringement amount for purposes of subsection (b)(1)," the "infringement amount is the retail value of the infringed item, multiplied by the number of infringing items" where the infringing item "(I) is, or appears to a reasonably informed purchaser to be, identical or substantially equivalent to the infringed item; or (II) is a digital or electronic reproduction of the infringed item."[1]  U.S.S.G. § 2B5.3 app. note 2(A)(i).  Retail value is further defined in the Guidelines as "the retail price of that item in the market in which it is sold."  U.S.S.G. § 2B5.3 app. note 2(C).  Consistent with this, Application Note 3 to Guideline 2B1.1 states that the Court should apply the greater of actual loss or intended loss in determining the loss level enhancement under § 2B1.1(b)(1).  In prescribing how loss should be estimated under the Guidelines, Application Note 3(C) states that the "court need only make a reasonable estimate of the loss" and that the "estimate of the loss shall be based on available information."  *See also Scuderi*, 1998 WL 161103, at *1 (noting "that the court's determination of such value need not be precise.")  An estimate of the loss can be based on the "fair market value of the property unlawfully taken, copied, or destroyed," which is consistent with the retail value set forth in the application notes for § 2B5.3.  U.S.S.G. § 2B1.1 app. Note 3(C)(i).

The Defendant was selling copyrighted titles that were near indistinguishable from their retail counterparts.  These titles came in boxes that mimicked the retail packaging and the discs sold by the Defendant included the name of the title and various copyrighted logos typically present on legitimate titles.  (*See* Ex. 1.)  Some of these boxes went so far as to include the

---

[1] Because the infringing items sold in this case were intended to appear to a reasonably informed purchaser to be identical or substantially equivalent to the infringed items, the retail value of the infringed items apply and not the retail value of the infringing items.  U.S.S.G. § 2B5.3 app. note 2(B) (noting that the retail value of the infringing item applies only in a "case not covered by subdivision (A) of this Application Note.)

admonishments typically present on legitimate copyrighted discs, telling the buyer that they cannot copy or export the title without permission from the copyright holder.  (*See* Ex. 1 at 4, 10, 16.)  And, they had to be, because the Defendant's criminal scheme was aimed at selling illegitimate copies of copyrighted movies and shows—passing them off as the real thing—for monetary gain.  To entice his buyers to purchase these items, the Defendant used descriptions such as "New Factory Sealed" or "Brand New" and users who purchased these items believed they were purchasing a legitimate DVD.  (*See, e.g.,* Exs. 2-6.)  In reviews, users on eBay who had purchased the Defendant's counterfeit DVDs (where noted in the reviews "Sold by: jathny") noted that the discs were a "bogus copy" that locked up their players and "didn't work for [them]" because they "wouldn't get past the FBI Piracy warning."  (Ex. 2; *see also* Ex. 7 (noting that the Defendant was selling a "bootleg illegal copy" of the film Black Panther and that the Defendant's DVD of Lady and the Tramp was confirmed by the Disney store to be "[p]irated, counterfeit.")  These were all individual consumers looking to purchase legitimate copies of these movies and shows, because the Defendant had advertised his counterfeit titles as such.  (*See* Ex. 7 (noting that Defendant's DVD was "a bootleg DVD.  Not new in factory seal like advertised."))

Since the Defendant was selling his counterfeit titles to individual consumers, the retail price at which these titles are typically sold to consumers is the appropriate market for determining retail value for the purposes of calculating the Defendant's intended loss.  *See* U.S.S.G. § 2B5.3 app. note 2(C).  Special Agent Michael Shao created a summary chart of all the counterfeit DVD titles sold by the Defendant using data from eBay, PayPal, Bonanza, and Sears.  (Ex. 8, 9.)  For each sale, Special Agent Shao has included the counterfeit title sold by the Defendant ("Title"), the quantity sold by the Defendant ("Qty Sold"), the price at which the Defendant sold each counterfeit DVD ("Sale Price"), and the total sale made by the Defendant as determined by

5

multiplying the quantity sold with the sale price ("Sale Price x Qty Sold"). (Ex. 8 ¶ 3.) This sum—$241,445.57—are the Defendant's proceeds from his criminal conduct based on selling 18,306 infringing DVDs. (Ex. 9 at 296.)

Special Agent Shao also consulted with the Motion Picture Association ("MPA").[2] (Ex. 8 ¶ 4.) The MPA is a trade association representing the five major film studios in the United States, as well as Netflix. (Ex. 11 at 1.) The MPA researched the price being offered for each DVD title from four online vendors. The average price from the four vendors was computed and listed for each title ("Retail Price"). (*See* Ex. 8 ¶ 4; Ex. 9.) As noted in Special Agent Shao's declaration, where less than three of the online vendors offered the DVD title for sale or where there was no comparable product offered for retail sale by the copyright holder, the MPA researched the title through a third-party industry analysis firm to determine the retail price. (Ex. 8 ¶ 4.) Special Agent Shao also consulted with Beachbody, LLC to determine the retail price of their exercise DVDs. (Ex. 8 ¶ 5.) The extensive analysis undertaken by Special Agent Shao and the MPA is sufficient to provide the Court with a "reasonable estimate of the loss" based on "available information" of the retail/fair market value of the property that the Defendant counterfeited and sold for profit. *Scuderi*, 1998 WL 161103, at *1. Accordingly, the retail value of each infringed item multiplied by the number of infringing items (18,306) results in a total retail value of $315,761.44 for the copyright infringed items.[3]

---

[2] Until September 2019, the MPA was previously known as the Motion Picture Association of America (MPAA).

[3] The Stipulation of Facts in the Plea states that $315,761.44 is the manufacturer suggested retail price ("MSRP") of the 18,306 counterfeit DVDs sold by the Defendant. This is incorrect and the $315,761.44 is instead the retail price based on the analysis described in Special Agent Shao's declaration. (Ex. 8 ¶ 4.) Counsel for the Defendant was informed about this discrepancy prior to the submission of the Defendant's sentencing memorandum.

The Defendant's suggested loss of $10,000 to $30,000 based on hypothetical "foregone licensing revenue to the copyright holders" has no basis in fact nor does it have any basis in law or the applicable Sentencing Guidelines. (Def. Sentencing Memorandum at 13.) The Defendant supplies no basis for establishing, and therefore providing facts that the Court can rely on, that the copyright holders' loss is a mere 12% ($30,000 out of $315,761.44) of the retail value of the copyright infringed titles. To the contrary, as provided by the MPA in their victim impact statement, the wholesale value of the infringed titles—the money that would have gone to the studios—is instead $145,986.53. (*See infra* § IV(B); *see also* Ex. 11 at 2.) Notwithstanding this, neither the numbers the Defendant has proposed without basis nor the wholesale value are what is clearly prescribed by the Guidelines in order to determine loss under §§ 2B5.3 and 2B1.1—"reasonably foreseeable pecuniary harm." Calculating the harm based on the retail value of the stolen property is the appropriate basis for determining the loss caused by a defendant in such a case—a loss felt throughout the entire retail chain, which encompasses not only the copyright license holders, but also the retailers and the thousands and hundreds of thousands of individuals involved in producing the entertainment on these DVDs. *See, e.g., United States v. Susel*, 429 F.3d 782, 784 (8th Cir. 2005) (stating that "district court did not commit clear error in calculating the loss as the retail value of the stolen property.") Therefore, pursuant to U.S.S.G. §§ 2B5.3(b) and 2B1.1(b)(1), a 12-level enhancement applies because the loss caused by the Defendant exceeded $250,000 but was less than $550,000.

  B. *The Evidence Establishes that the Defendant Imported Counterfeit Titles from China*

Though the Defendant objected to the enhancement for importation of infringing items in the plea, (Plea ¶ 6(c)), this issue was not addressed in the Defendant's sentencing memorandum. The Defendant was interviewed by law enforcement at his residence on May 30, 2018. (Ex. 10.)

During the conversation, the Defendant was shown a packaging label for a shipment from China to the Defendant's home address. The Defendant identified the "To:" address on the label as his residence and stated that the name of the company, "Insperity, Inc.," on the label was previously used by him. (Ex. 10 at 2.) The Defendant stated that he used this company name when purchasing items from China, which included DVDs. The Defendant estimated that he purchased Disney and television show DVDs "approximately four or five times" and that he used the fictitious company name "to protect himself from Chinese people having his real name." (Ex. 10 at 2.) When the Defendant was shown the contents of the seized package, the Defendant stated that it appeared to be a wrong order and he re-confirmed that he ordered Disney DVDs from China. (*Id.*)

Further in the interview, the Defendant also admitted that he was aware the DVDs he was selling were counterfeit "because he bought them from China and also because the prices he paid for them were much cheaper than normal prices." (*Id.* at 3.) The Defendant stipulated to this fact in the Stipulation of Facts in the Plea, (Plea at 10), and his sentencing memo admits that the DVDs he was buying for sale were "from China," (Def. Sentencing Memo at 5).

Based on the Defendant's own admissions in the stipulated facts, as well as his statements to law enforcement, the Government has established by a preponderance of the evidence that a 2-level enhancement applies because the Defendant's offense involved the importation of infringing items.

Therefore, applying the **12**-level enhancement because the loss amount exceeded $250,000, and a **2**-level enhancement for importing infringing items from China, the Defendant has a total offense level of **22**. (*See* Plea ¶¶ 6(b)-(c); PSR ¶¶ 21-26.)

**IV.** **Forfeiture Judgment and Restitution**

  A. *Forfeiture Judgment in the Amount of the Defendant's Gross Proceeds*

The Government asks the Court to incorporate the motion for forfeiture of property and preliminary order of forfeiture, filed on May 4, 2021, (ECF No. 22), into the sentencing proceeding. The Defendant does not dispute that he in fact made the 18,305 sales in the spreadsheet attached to Special Agent Shao's declaration and that his total gross proceeds were $241,370.58. (*See* ECF No. 22-3.) As noted in the Government's motion for forfeiture of property, the Defendant should not be allowed to deduct the costs of operating his criminal business.

  B. *Restitution to the Victim Copyright Holders in the Amount of $145,986.53 is Appropriate in this Case*

Additionally, under the Mandatory Victims Restitution Act ("MVRA"), a defendant is required to make full restitution for offenses in which an identifiable victim has suffered a pecuniary loss. *Id.* § 3663A(c)(1)(B). The Government must demonstrate the victim's loss by a preponderance of the evidence, *Id.* § 3664(a), (e), and the MVRA limits any award "to the victim's 'actual losses.'" *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (stating that "restitution in a criminal copyright case must reflect the victim's actual losses, not the defendant's gain"); *see also United States v. Fair*, 699 F.3d 508, 513 (D.C. Cir. 2012) (finding that "defendant's gain is not an appropriate measure of the victim's actual loss in MVRA calculations.") "Calculating loss under the MVRA must be done with 'some precision,' although 'exact precision' is not required." *United States v. Rakhamimov*, No. WDQ-13-0662, 2015 WL 6739579, at *4 (D. Md. Nov. 2, 2015) (quoting *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015)). "So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." *United States v. Mejia*, 326 F. App'x 710, 712 (4th Cir. 2009).

9

Based on the Stipulation of Facts, it is undisputed that ABC Studios/Disney, Anchor Bay Entertainment, Disney, Fox, HBO Home Entertainment, Lionsgate, MGM, Netflix, Paramount, Sony, Universal, and Warner Brothers are the victim copyright holders in this case. *See United States v. Sterling*, 685 F. App'x 880, 884 (11th Cir. 2017) (stating that MPA members who were "intellectual property holders are victims of the crime of trafficking in counterfeit goods and thus are entitled to restitution to the extent that they suffered actual loss.")  In its victim impact statement, the MPA has calculated the losses to the copyright holders based on the wholesale value of the infringed titles to be $145,986.53.[4]  (Ex. 11 at 2.)  The wholesale value "takes into account the cost of creating and maintaining the intellectual property, including creating the television show, investment in production costs, maintaining the television show during its production life, producing, marketing, and shipping the DVDs, placing counterfeit protections on them so that they cannot be copied, and the intrinsic value of the trademarks and copyrights attached to them." *Sterling*, 685 F. App'x at 882-83.  As detailed in the MPA's victim impact statement, the MPA determined the average wholesale value of titles for each year (2009 through 2018) based on whether the counterfeit titles sold by the Defendant were movies or televisions shows.  (*See* Ex. 11 at 2); *see also Sterling*, 685 F. App'x at 882 (affirming district court's restitution order where MPA calculated the "average wholesale value of a genuine DVD box set" and relied on a one-year estimate as the lowest "conservative estimate" for a three-year period.)  The wholesale price was multiplied by the respective number of infringing titles.  In total, the wholesale value of the counterfeit movies (13,229 titles) sold by the Defendant from 2009 to 2018 was $89,654.59. (Ex.

---

[4] The Government has requested a restitution amount from Beachbody, LLC, but has not received such figures as of the date of this filing.  The Government has received a victim impact statement from Beachbody, LLC, which the Government will provide to the Court.  Should the Government receive a restitution amount from Beachbody, LLC, the Government will provide this to the Court and supplement the restitution request at sentencing.

11 at 2.) The wholesale value of the counterfeit television shows (5,221 titles) sold by the Defendant for the same time period was $56,331.94. (Ex. 11 at 2.) Because "the only loss that counts is that caused by the count of conviction," the MPA's analysis is limited to the Defendant's sales between May 2009 and May 2018—omitting the one additional sale on March 31, 2009. *United States v. George*, 403 F.3d 470, 474 (7th Cir. 2005).

The Eleventh Circuit has held that the wholesale value of the infringed titles is an appropriate basis for restitution in a copyright infringement case. *Sterling*, 685 F. App'x at 884. In *Sterling*, the district court found that the MPA members "suffered an actual loss of wholesale sales" where the counterfeit DVDs "(1) had indicia of authenticity, including that they were of high quality and looked nearly identical to genuine DVD box sets; (2) were priced similarly to genuine box sets; (3) were popular titles among purchasers and made up a large part of the MPAA members' sales; and (4) were sold in publicly recognized and accepted internet retail sales channels." *Id.*

Each one of these factors are present here. The counterfeit DVDs sold by the Defendant came with packaging that was identical to genuine DVDs, they were of a relatively high quality, and even copied trademarks and the anti-piracy cautions in order to appear authentic to the average consumer. (*See, e.g.,* Ex. 1.) Average customers who were looking to purchase legitimate copies of these titles were duped into purchasing the Defendant's counterfeit DVDs. (*See* Ex. 2 (user review noting that Defendant's DVD included "FBI Piracy warning" that the DVD would not go past); Ex. 7.) Similarly, as evidenced by the spreadsheet tabulating the Defendant's thousands of counterfeit DVD sales and the MPA's victim impact statement, though the prices sold by the Defendant varied, they were generally close to or in the range of the retail value of the copyrighted titles—with the Defendant changing his listing price to "stay competitive" with "other sellers."

(*See* Ex. 9 at 296 (average retail price of DVDs was $17.31 and average sales price of Defendant's DVDs was $13.20); Ex. 11 at 1; *see also* Ex. 10 at 4. *But see* Def. Sentencing Memo at 6 (noting that the Defendant paid $3.50 per DVD from China.))

The fact that the Defendant was selling popular titles is also apparent from the thousands of titles sold by the Defendant, including popular Disney films such as Aladdin, Beauty and the Beast, Black Panther, and Captain America: Civil War, popular films from other studios like The Fate of the Furious and Justice League, and popular television shows such as Game of Thrones, The Walking Dead, and Stranger Things. The MPA's victim impact statement confirms this. (Ex. 11 at 1.) Many of these titles were sold by the Defendant in the same year when they were released on DVD by their respective copyright holders, and thus when they were at the relative height of their popularity.[5] Finally, the Defendant's counterfeit DVDs were sold on eBay—a publicly recognized and accepted internet retail sales channel. See *Sterling*, 685 F. App'x at 882 (noting that the defendants "establish[ed] accounts at various online retail websites, such as Amazon and eBay" to sell their counterfeit DVDs.) As demonstrated by the comments left on the Defendant's eBay listings and the comments left on his seller page, the Defendant's customers sought out genuine DVDs, and instead were duped into buying counterfeits. (*See* Exs. 2, 7.) But for the Defendant's copyright infringement, the Defendant's customers would have purchased authentic

---

[5] For example, The Fate of the Furious was released on DVD on July 11, 2017, and the Defendant made his first sale of this title on July 16, 2017. *Compare* Amazon, "The Fate of the Furious: DVD + Digital," available at https://www.amazon.com/Fate-Furious-Vin-Diesel/dp/B06Y3MYS83 *with* (Ex. 9 at 194). Similarly, Game of Thrones Season 6 was released on DVD on November 15, 2016, and the Defendant was selling counterfeit copies of this title on that very same day. *Compare* Amazon, "Game of Thrones: The Complete Sixth Season," available at https://www.amazon.com/Game-Thrones-Complete-6th-Season/dp/B01H2JPTDO *with* (Ex. 9 at 24). Lastly, Black Panther was released on May 15, 2018, and the Defendant was selling pre-orders for this movie approximately *a month in advance* and through the first month following the title's release. *Compare* Amazon, "Black Panther," available at https://www.amazon.com/Black-Panther-Chadwick-Boseman/dp/B079FLYB41 *with* (Ex. 9 at 273-89.)

12

versions of the movies and television shows and the copyright holders would have received the wholesale value from these sales.

V.       **Relevant Sentencing Considerations Under 18 U.S.C. § 3553(a)**

For nine years, the Defendant engaged in a protracted scheme to buy counterfeit DVDs from China and then sell them to customers in the United States.  The Defendant knew he was buying counterfeit DVDs, and he knew that in order to have unwitting customers purchase these titles, he would have to advertise them as being legitimate.  As discussed in detail in the preceding sections, that is exactly what he did.  For his criminal efforts, the Defendant made approximately a quarter-of-a-million dollars over the nine years during which he sold these counterfeit movies and television shows.

Both the length of the conduct and the significant revenue generated by the Defendant speak to the severity of the nature and circumstances of this offense.  As discussed above, and contrary to the Defendant's contention in his sentencing memorandum, he was not merely engaged in the sale of "outdated DVD movies." (Def. Sentencing Memo at 5.)  In 2009, the Defendant sold copies of popular television shows such as Lost, Weeds, NCIS, and One Tree Hill.  (Ex. 9 at 1.)  Following this, starting in 2010, the Defendant expanded to selling counterfeit movies such as The Lion King while continuing to sell popular television shows such as The Mentalist, Lost, Glee, and Modern Family, among many others. (Ex. 9 at 1-11.)  As the Defendant's sales grew, he continued to sell popular titles at and even before their release dates—such as in the case of Black Panther—advertising them as authentic.

The Defendant knew what he was doing was illegal. (Ex. 10 at 3 (stating that the Defendant "acknowledged knowing it was a crime to sell illegal products such as counterfeit goods.")  As the Defendant acknowledged in his interview with law enforcement, he "was aware the DVDs [from

China] were counterfeit." (*Id.*)  The Defendant had also had his previous shipments of counterfeit DVDs seized by law enforcement.  (*Id.* at 2 (Defendant noting that he had received a seizure notice from U.S. Customs and Border Patrol.))  The Defendant knew that his packages were seized "due to the DVDs being counterfeit." (*Id.* at 4.)  Still, even after his supplier in China stopped sending packages to the Defendant's residence following law enforcement's seizure of the counterfeit DVDs, the Defendant continued to engage in his criminal business and provided other addresses, including his work address, and used fictitious names to receive his packages containing counterfeit DVDs.  (*Id.* at 5-6.)  Similarly, the Defendant created a number of online accounts at eBay and PayPal to further his criminal business, which was due in part because eBay and PayPal would terminate his accounts.  (*Id.* at 3, 8.)   All of this evidences the great lengths that the Defendant went to in order to continue his profitable criminal conduct.

The length of the Defendant's criminal conduct, substantiated by the thousands of counterfeit DVD sales made by the Defendant and the hundreds of thousands of dollars the Defendant made by engaging in this criminal activity, reflect the seriousness of the offense.  This is not a victimless crime.  The people and companies who are involved in the financing and production of these movies and television shows spend significant amounts of time, money, and effort.  Livelihoods are created and supported based on this work.  Individuals like the Defendant who sell counterfeit versions of these movies and televisions shows deprive the individuals and corporations involved in this effort of the legitimate revenue from their work.  In turn, they also increase the prices charged to the general public for these products, both to make up for lost revenue and to recoup the costs of developing copyright protection technologies to further deter such copyright infringement.  Independently, the Defendant's continued engagement in this criminal business after he knew that he was violating the law demonstrates the Defendant's lack

of respect for the law.  In contrast, the Defendant has no criminal history and he appears unlikely to re-engage in recidivism, mitigating the need for a severe sentence.  Accordingly, in light of these opposing factors, the Government believes that a sentence at the low end of the Guidelines—30 months—will be sufficient, but not greater than necessary under the § 3553(a) factors.  Importantly, a sentence that includes a period of incarceration will provide adequate deterrence to others like the Defendant who may contemplate engaging in such a criminal business venture.

Accordingly, the Government submits that a sentence of 30 months in prison is sufficient, but not greater than necessary in light of the nature and circumstances of this offense, the Defendant's criminal history, and the need to provide adequate deterrence for this Defendant and generally.  A 5-year term of supervised release is also appropriate and necessary to ensure that the Defendant repays his restitution for the sizeable losses suffered by his victims.

## VI.   Conclusion

For the foregoing reasons, and additional information that may be presented at the sentencing hearing, the Government respectfully submits that a sentence of **30 months in prison, followed by 5 years of supervised release**, is sufficient but not greater than necessary to meet the purposes of sentencing as enumerated in the § 3553(a) factors.

Respectfully submitted,

Jonathan F. Lenzner<br>Acting United States Attorney

By:     /s/
        Rajeev R. Raghavan
        Thomas M. Sullivan
        Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing was filed electronically on May 13, 2021, and thus served upon defense counsel.

/s/
Rajeev R. Raghavan
Assistant United States Attorney